# In the United States Court of Federal Claims

BID PROTEST
No. 19-742C
Filed Under Seal: August 26, 2019
Reissued: August 28, 2019[*]

| | |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES CORP., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| Defendant, | ) ) ) |
| v. | ) ) |
| BLUE ORIGIN, LLC, *et al.*, | ) ) ) |
| Defendant-Intervenors. | ) ) |

Post-Award Bid Protest; Motion to Dismiss; Rule 12(b)(1); Other Transactions; 10 U.S.C. §§ 2371 and 2371b.

*Craig A. Holman*, Attorney of Record, *Kara L. Daniels*, *David M. Hibey*, *Sonia Tabriz*, *Nathaniel E. Castellano*, Of Counsel, Arnold & Porter Kaye Scholer LLP, Washington, DC, for plaintiff.

*Tanya B. Koenig*, Trial Attorney, *Douglas Edelschick*, Of Counsel, *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Joseph H. Hunt*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; *Erika Whelan Retta*, Air Force Legal Operations Agency; *Gregory Yokas*, Space and Missile Systems Center, Office of the Staff Judge Advocate, for defendant.

---

[*] This Memorandum Opinion and Order was originally filed under seal on August 26, 2019 (docket entry no. 75). The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted from the Memorandum Opinion and Order. The parties filed a joint status report on August 27, 2019 (docket entry no. 76) indicating that no redactions are necessary. And so, the Court is reissuing its Memorandum Opinion and Order, dated August 26, 2019 as the public opinion.

*Scott E. Pickens*, Counsel of Record, *Michael A. Hordell*, *Matthew J. Michaels*, *Scott N. Godes*, Of Counsel, Barnes & Thornburg LLP, Washington, DC, for Blue Origin, LLC, defendant-intervenor.

*Todd R. Steggerda*, Counsel of Record, *Benjamin L. Hatch*, *Edwin O. Childs, Jr.*, *Nathan R. Pittman*, *Karlee S. Blank*, *Blake R. Christopher*, Of Counsel, McQuireWoods, LLP, Washington, DC, for United Launch Services, LLC, defendant-intervenor.

*Kevin Patrick Mullen*, Counsel of Record, *David A. Churchill*, *Sandeep N. Nandivada*, *R. Locke Bell*, *Lauren J. Horneffer*, *Charles L. Capito III*, Of Counsel, Morrison & Foerster, LLP, Washington, DC; *Maureen F. Del Duca*, *Kenneth M. Reiss*, Of Counsel, Northrop Grumman Corporation, Falls Church, VA, for Orbital Sciences Corporation, defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

GRIGGSBY, Judge

## I.   INTRODUCTION

In this post-award bid protest matter, Space Exploration Technologies Corp. ("SpaceX") challenges the United States Air Force Space and Missile Systems Center's (the "Air Force") evaluation and portfolio award decisions for a request for proposals to provide space launch services for national security missions, issued pursuant to the Department of Defense's ("DoD") authority to enter into other transaction agreements.  *See generally* Compl.  The government has moved to dismiss this matter for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  *See generally* Def. Mot. SpaceX has also moved to transfer this matter to the United States District Court for the Central District of California.  *See generally* Pl. Resp.  For the reasons discussed below, the Court:  (1) **GRANTS** the government's motion to dismiss; (2) **GRANTS** SpaceX's motion to transfer venue; and (3) **DISMISSES** the complaint.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.   Factual Background

SpaceX provides space launch services to the United States Government and to commercial customers.  Compl. at ¶ 90.  In this post-award bid protest matter, SpaceX

---

[1] The facts recited in this Memorandum Opinion and Order are taken from the complaint ("Compl."); the corrected administrative record ("AR"); and the government's motion to dismiss ("Def. Mot.").  Except where otherwise noted, the facts stated herein are undisputed.

challenges the Air Force's evaluation and portfolio award decisions for launch service agreement ("LSA") request for proposal, Solicitation No. FA8811-17-9-001 (the "LSARFP"), to facilitate the development of launch systems in the United States.  Compl. at 1.  As relief, SpaceX requests, among other things, that the Court:  (1) declare the Air Force's portfolio award decision to be contrary to Congress's mandate for assured access to space; (2) enjoin any further investment in the launch service agreements awarded by the Air Force; (3) enjoin further performance by the awardees; and (4) require the Air Force to reevaluate proposals.  *Id*. at 78.

### 1.  DoD's Authority To Use Other Transaction Agreements

As background, Congress granted the Department of Defense the authority to enter into other transactions ("OT").  10 U.S.C. §§ 2371(a) and 2371b(a).  OTs are agreements that are not procurement contracts, cooperative agreements, or grants.  *See, e.g.*, 10 U.S.C. § 2371(a) (authorizing "transactions (other than contracts, cooperative agreements, and grants)"); 32 C.F.R. § 3.2 (defining "other transactions" as "transactions other than contracts, grants or cooperative agreements"); *see also* United States Department of Defense, Other Transactions Guide (2018), at 5 ("OT Guide"), https://www.dau.mil/guidebooks/Shared%20Documents/Other%20 Transactions%20(OT)%20Guide.pdf (defining OTs as "NOT:  a. FAR-based procurement contracts; b. Grants; c. Cooperative Agreements; or d. Cooperative Research and Development Agreements (CRADAs)").

While not defined by statute, the Government Accountability Office ("GAO") has defined OTs as follows:

> An 'other transaction' agreement is a special type of legal instrument used for various purposes by federal agencies that have been granted statutory authority to use 'other transactions.'  GAO's audit reports to the Congress have repeatedly reported that 'other transactions' are 'other than contracts, grants, or cooperative agreements that generally are not subject to federal laws and regulations applicable to procurement contracts.'

*MorphoTrust USA, LLC*, B-412711, 2016 WL 2908322, at *4 (Comp. Gen. May 16, 2016).  The DoD's OT Guide also provides that OTs are intended "to give DoD the flexibility necessary to adopt and incorporate business practices that reflect commercial industry standards and best practices into its award instruments."  OT Guide at 4.  And so, OTs are "generally not subject to the Federal laws and regulations limited in applicability to contracts, grants or cooperative

agreements" and these agreements are "not required to comply with the Federal Acquisition Regulation (FAR) and its supplements." 32 C.F.R. § 3.2.

Pursuant to 10 U.S.C. § 2731b, DoD may use its other transaction authority to "carry out prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces." 10 U.S.C. § 2731b(a).[2] But, DoD may only use this authority if one of the four conditions set forth below have been met:

> (A) There is at least one nontraditional defense contractor or nonprofit research institution participating to a significant extent in the prototype project.

> (B) All significant participants in the transaction other than the Federal Government are small businesses (including small businesses participating in a program described under section 9 of the Small Business Act (15 U.S.C. [§] 638)) or nontraditional defense contractors.

> (C) At least one third of the total cost of the prototype project is to be paid out of funds provided by sources other than the Federal Government.

> (D) The senior procurement executive for the agency determines in writing that exceptional circumstances justify the use of a transaction that provides for innovative business arrangements or structures that would not be feasible or appropriate under a contract, or would provide an opportunity to expand the defense supply base in a manner that would not be practical or feasible under a contract.

10 U.S.C. § 2371b(d)(1); *see also* OT Guide at 13-14; 32 C.F.R. § 3.5. In addition, Congress has required that, "[t]o the maximum extent practicable, competitive procedures shall be used when entering into [OT] agreements to carry out the prototype projects." 10 U.S.C. § 2371b(b)(2).

## 2. The National Security Space Launch Program

The National Security Space Launch program—previously known as the EELV program (the "Program")—is charged with procuring launch services to meet the government's national security space launch needs. AR Tab 19 at 786. The Program has an overarching need through

---

[2] Title 10, United States Code, section 2358 authorizes DoD to "engage in basic research, applied research, advanced research, and development projects." 10 U.S.C. § 2358(a).

FY30 to address the challenges of maintaining affordability and assured access to space, which requires the Air Force to sustain the availability of at least two families of space launch vehicles and a robust space launch infrastructure and industrial base.  *Id.* at 787; *see also* 10 U.S.C. § 2273(b).  The actions necessary to ensure continued access to space have been defined by Congress to include:

> (1) the availability of at least two space launch vehicles (or families of space launch vehicles) capable of delivering into space any payload designated by the Secretary of Defense or the Director of National Intelligence as a national security payload
>
> (2) a robust space launch infrastructure and industrial base; and
>
> (3) the availability of rapid, responsive, and reliable space launches for national security space programs to—
>
>> (A) improve the responsiveness and flexibility of a national security space system;
>>
>> (B) lower the costs of launching a national security space system; and
>>
>> (C) maintain risks of mission success at acceptable levels.

10 U.S.C. §2273(b).

As shown below, the Program involves a multi-phase strategy that will be implemented by the Air Force between FY 2013 and FY 2027 to accomplish the aforementioned actions.  AR Tab 19 at 788.



*Id.*

### a.      The LSA Competition

The LSARFP involves a competition for the development of space launch vehicles (the "LSA Competition"). *Id.* at 788.  During the LSA Competition, the Air Force sought to develop "launch system prototypes, to include the development and test of any required [rocket propulsion systems], the launch vehicle and its subsystems, infrastructure, manufacturing processes, test stands, and other items required for industry to provide domestic commercial launch services that meet all [National Security Space] requirements." AR Tab 38 at 1261.  The prototype sought to be developed during the LSA Competition includes "[a] fully developed and certified EELV Launch System, including the validation of all non-recurring engineering (NRE) work." *Id.*  And so, the awardees of the LSA will receive funding from the Air Force and these awardees "will perform prototype development, including system design and development, risk reduction activities, test and evaluation activities, and technical demonstration of system capabilities." AR Tab 19 at 796.

The Air Force expects that following its investment "in the development of prototypes for launch systems," those systems can be "used to provide commercial launch services that will also be extended to provide [National Security Space] launch services." *Id.* at 793.  The Air Force also acknowledges that the LSAs will "facilitate development of at least three EELV Launch System prototypes as early as possible, allowing those launch systems to mature prior to a future selection of two [National Security Space] launch service providers for Phase 2 launch service procurements, starting in FY 20[20]." AR Tab 38 at 1260.

### b.      The Phase 2 Procurement

During Phase 2 of the Program, the Air Force anticipates awarding two requirements contracts for launch services, delivering multiple national security space missions with annual ordering periods from FY 2020 through FY 2024.  Compl. Ex. B at 2.  Congress has mandated that, with some exceptions, "the Secretary of Defense may not award or renew a contract for the procurement of property or services for space launch activities under the [Program] if such contract carries out such space launch activities using rocket engines designed or manufactured in the Russian Federation." FY 2015 National Defense Authorization Act, Pub. L. No. 113-291,

128 Stat. 3292, 3626 (2014).  And so, a key goal of the Program is to transition from the use of non-allied space launch engines.  AR Tab 38 at 1260.

The Air Force has described the Phase 2 Procurement as a "follow-on activit[y]."  AR Tab 19 at 807; *see also id.* at 810 ("The follow-on activity will be procurement of launch services.")  The Air Force has also stated that the "LSA is designed to work in synergy with commercial launch vehicle development efforts that will lead in space for decades to come."  AR Tab 47 at 1351.

The Phase 2 Procurement is open to all interested offerors.  AR Tab 19 at 807.  And so, this procurement will not be limited to the organizations that have received awards during the LSA Competition.  *See* AR Tab 19 at 786 ("FAR-based procurement contracts will be competitively awarded to certified EELV launch service providers, which could include companies that were not previously awarded LSAs"); *id.* at 807 ("[T]he Air Force intends to use a full and open competition to award FAR-based [firm-fixed priced] contracts to two launch providers for [National Security Space] launch service procurements . . ."); *see also* Status Conf. Tr. at 17:1-17:5, 18:15-18:18.

### 3.  The LSA Award

The Air Force issued the LSARFP on October 5, 2017.  *See generally* AR Tab 35.  On March 21, 2018, the Assistant Secretary of the Air Force (Acquisition, Technology & Logistics) determined that "exceptional circumstances surrounding the [Program] and the domestic launch industry justify the use of a transaction that provides for innovative business arrangements and provide[s] an opportunity to expand the defense supply base in a manner that would not be feasible under a contract."  AR Tab 47 at 1349.  And so, the Air Force issued the LSARFP pursuant to DoD's authority to enter into other transactions.  *Id.*

SpaceX and three other companies—United Launch Alliance, LLC ("ULA"), Blue Origin, LLC ("Blue Origin") and Orbital Sciences Corporation ("Orbital ATK")—submitted proposals in response to the LSARFP.  *See* AR Tab 136 at 41752.  Following discussions, negotiations and the receipt of revised proposals, the Air Force awarded LSAs to Blue Origin, ULA, and Orbital ATK in October 2018.  *Id.* at 41753.  The LSAs awarded to ULA, Blue Origin, and Orbital ATK provide these awardees with investment funding to develop launch vehicle prototypes.  AR Tab 38 at 1261.

SpaceX filed an objection to the aforementioned portfolio awards with the Air Force on December 10, 2018.  Compl. at ¶ 76; Compl. Ex. R at 2.  The Air Force subsequently denied SpaceX's objection on April 18, 2019.  Compl. at ¶ 79; Compl. Ex. R at 1.  SpaceX commenced this post-award bid protest action on May 17, 2019.  *See generally* Compl.

### B.  Procedural Background

SpaceX commenced this post-award bid protest matter on May 17, 2019.  *See generally id.*  On May 21, 2019, Blue Origin and ULA filed unopposed motions to intervene in this matter. *See generally* Blue Origin Mot. to Intervene; ULA Mot. to Intervene.  On May 22, 2019, the Court granted these motions and entered a Protective Order in this matter.  *See generally* Scheduling Order, dated May 22, 2019; *see also* Protective Order, dated May 22, 2019.  On May 22, 2019, Orbital ATK filed an unopposed motion to intervene.  *See generally* Orbital Mot. to Intervene.  On May 23, 2019, the Court granted this motion.  *See generally* Order, dated May 23, 2019.

On June 11, 2019, the government filed the administrative record.  *See generally* Initial AR.  On June 13, 2019, the government filed a motion to dismiss this matter for lack of subject-matter jurisdiction.  *See generally* Def. Mot.  On June 26, 2019, the government filed a corrected administrative record.  *See generally* AR.

On June 28, 2019, SpaceX filed a response and opposition to the government's motion to dismiss and, in the alternative, a motion to transfer venue.  *See generally* Pl. Resp.  On July 9, 2019, the government filed a reply in support of its motion to dismiss and a response to SpaceX's motion to transfer venue.[3]  *See generally* Def. Reply.  On August 15, 2019, the Court held oral argument on the parties' motions.  *See generally* Oral Arg. Tr.

These matters having been fully briefed, the Court resolves the pending motions.

## III.  LEGAL STANDARDS

### A.  RCFC 12(b)(1)

When deciding a motion to dismiss upon the ground that the Court does not possess subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all factual

---

[3] ULA, Blue Origin, and Orbital ATK have not participated in the briefing of the government's motion to dismiss.

allegations in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); RCFC 12(b)(1).  But, a plaintiff bears the burden of establishing subject-matter jurisdiction, and it must do so by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citing *Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969)).  Should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006); RCFC 12(h)(3).

### B.      Bid Protest Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  The United States Court of Appeals for the Federal Circuit has held that the Tucker Act's bid protest language "is exclusively concerned with procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010); *see also United States v. Testan*, 424 U.S. 392, 399 (1976) ("[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'") (citation omitted).  And so, relief in bid protest matters pursuant to the Tucker Act is unavailable outside the context of a procurement or proposed procurement. *Res. Conservation*, 597 F.3d at 1245; *see, e.g.*, *Hymas v. United States*, 810 F.3d 1312, 1329-30 (Fed. Cir. 2016) (finding no jurisdiction over cooperative farming agreements).

The Tucker Act does not define the term "procurement." *See generally* 28 U.S.C. § 1491(b)(1).  But, the Federal Circuit has relied upon the definition of procurement set forth in 41 U.S.C. § 111 to determine whether a procurement has occurred. *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (this section was formerly cited as 41 U.S.C. § 403(2)).  Section 111 defines procurement to cover "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111; *see also AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1330 (Fed. Cir. 2018); 10 U.S.C. §2302(3) (stating

that the term "procurement" has the meaning provided in chapter 1 of title 41, United States Code). And so, the Federal Circuit has held that, to establish jurisdiction, a contractor must show "'that the government at least initiated a procurement, or initiated the process for determining a need for acquisition.'" *AugustaWestland*, 880 F.3d at 1330 (quoting *Distributed Sols.*, 539 F.3d at 1346) (internal quotations omitted).

Specifically relevant to this dispute, in *Hymas*, the Federal Circuit held that the competitive requirements of CICA did not apply to the United States Fish and Wildlife Service's cooperative farming agreements, because the cooperative farming agreements were not procurement contracts under the Federal Grant and Cooperative Agreement Act. 810 F.3d at 1320, 1329-30. And so, the Federal Circuit concluded that this Court must dismiss a bid protest action challenging the government's award of these agreements for lack of subject-matter jurisdiction. *Id.* at 1330.

The Federal Circuit has also considered the meaning of the phrase "in connection with a procurement or a proposed procurement." *See* 28 U.S.C. § 1491(b)(1). In this regard, the Federal Circuit has held that "[t]he operative phrase 'in connection with' is very sweeping in scope." *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). The Federal Circuit has also held that an alleged statutory violation suffices to supply Tucker Act jurisdiction, so long as the statute has a connection to a procurement proposal. *Id.* In addition, the Federal Circuit has recognized that Congress intended for all objections connected to a procurement or proposed procurement to be heard by this Court. *See Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1079 (Fed. Cir. 2001) (noting that the Administrative Dispute Resolution Act of 1996 made clear that "Congress sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims"). And so, the Federal Circuit has held that "a narrow application of section 1491(b)(1) does not comport with the [Tucker Act's] broad grant of jurisdiction over objections to the procurement process." *Sys. App. & Techs., Inc. v. United States*, 691 F.3d 1374, 1381 (Fed. Cir. 2012).

There are, however, limits to the Court's bid protest jurisdiction under the Tucker Act. For example, the Federal Circuit held in *AgustaWestland* that an execution order regarding the use of Army helicopters was not "in connection with a procurement or proposed procurement," "because it did not begin 'the process for determining a need for property or services.'" 880

F.3d at 1331 (quoting *Distributed Sols.*, 539 F.3d at 1345).  In *Geiler/Schrudde & Zimmerman v. United States*, the Federal Circuit also held that the Department of Veterans Affairs' revocation of a bidder's status as a service-disabled veteran-owned small business was not a decision "in connection with a procurement or a proposed procurement," because the revocation had no effect upon the award or performance of any contract.  743 Fed. App'x 974, 977 (Fed. Cir. 2018).

Similarly, in *BayFirst Sols, LLC v. United States*, this Court addressed the limits of the phrase "in connection with a procurement or proposed procurement" in determining whether the Federal Acquisition Streamlining Act's bar on challenges in connection with the issuance or proposed issuance of a task or delivery order would bar the cancellation of a solicitation.  104 Fed. Cl. 493, 507 (2012).  In that case, the Court determined that the cancellation decision was not "in connection with" the task order award, because the cancellation decision was "a discrete procurement decision and one which could have been the subject of a separate protest."  *Id.* Lastly, in *R&D Dynamics Corp. v. United States*, this Court held that a Phase II Small Business Innovation Research ("SBIR") non-procurement award was not "in connection with" a Phase III procurement, because the SIBR Phase II program appeared to be "of a developmental nature." 80 Fed. Cl. 715, 722 (2007).  And so, the Court determined that the SBIR award was not "in connection with" a procurement, notwithstanding the possibility that the SBIR award "may ultimately lead to the development of a capacity to provide goods or services in Phase III."  *Id.*

### C.    10 U.S.C. §§ 2371 And 2371b

Title 10, United States Code, section 2371 generally provides DoD with the statutory authority to enter into other transaction agreements in carrying out "basic, applied, and advanced research projects."  10 U.S.C. § 2371(a).  Pursuant to Title 10, United States Code, section 2371b, DoD may use its OT authority to carry out certain prototype projects. 10 U.S.C. § 2371b. Specifically, this statute provides that DoD may:

> carry out prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces.

10 U.S.C. §2371b(a)(1).  Section 2371b also requires that, "[t]o the maximum extent practicable," DoD use competitive procedures when entering into agreements to carry out the

prototype projects. *Id.* at § 2371b(b)(2). In addition, the statute provides that DoD may only use this authority if one of the following conditions are met:

> (A) There is at least one nontraditional defense contractor or nonprofit research institution participating to a significant extent in the prototype project.
>
> (B) All significant participants in the transaction other than the Federal Government are small businesses (including small businesses participating in a program described under section 9 of the Small Business Act (15 U.S.C. [§] 638)) or nontraditional defense contractors.
>
> (C) At least one third of the total cost of the prototype project is to be paid out of funds provided by sources other than the Federal Government.
>
> (D) The senior procurement executive for the agency determines in writing that exceptional circumstances justify the use of a transaction that provides for innovative business arrangements or structures that would not be feasible or appropriate under a contract, or would provide an opportunity to expand the defense supply base in a manner that would not be practical or feasible under a contract.

*Id.* at § 2371b(d)(1).

**D.     Transfer Of Venue**

Lastly, Title 28, United States Code, section 1631 provides that:

> Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed.

28 U.S.C. § 1631. The Federal Circuit has held that the burden is on the party seeking transfer "to identify the proposed transferee court and show that jurisdiction would be proper there." *Maehr v. United States*, 767 Fed. App'x 914, 916 (Fed. Cir. 2019) (per curiam) (citing *Hill v. Dep't of the Air Force*, 796 F.2d 1469, 1470-71 (Fed. Cir. 1986)). And so, the Court may transfer a matter to a district court, if the Court determines that it lacks subject-matter jurisdiction to consider a matter and that a transfer of venue would be in the interest of justice. 28 U.S.C. § 1631.

### IV.    LEGAL ANALYSIS

The government has moved to dismiss this post-award bid protest matter for lack of subject-matter jurisdiction upon the ground that SpaceX's challenges to the Air Force's evaluation and portfolio award decisions are not "in connection with a procurement or proposed procurement," as contemplated by the Tucker Act.  Def. Mot. at 24-32.  The government also argues that the Court should dismiss this matter for want of subject-matter jurisdiction, because SpaceX does not allege a violation of a procurement statute.  *Id*. at 32-33.  And so, the government contends that the claims asserted in this bid protest matter fall beyond the boundaries of the Tucker Act.  *Id*. at 20-24.

In its response and opposition to the government's motion to dismiss, SpaceX counters that the Court may entertain this bid protest matter because SpaceX alleges non-frivolous violations of law that are in connection with the Air Force's ongoing procurement of launch services during Phase 2 of the National Security Space Launch Program.  Pl. Resp. at 19-25.  SpaceX also contends that the Court possesses subject-matter jurisdiction to consider its claims, because the Air Force violated 10 U.S.C. § 2371b and the Administrative Procedure Act, 5 U.S.C. §§ 551-59, during the LSA Competition.  *Id*. at 31-37.  And so, SpaceX requests that the Court deny the government's motion to dismiss, or, alternatively, transfer this matter to the United States District Court for the Central District of California.  *Id*. at 37-39.

For the reasons set forth below, SpaceX has not shown that the Court possesses subject-matter jurisdiction to consider any of its claims.  And so, the Court:  (1) **GRANTS** the government's motion to dismiss; (2) **GRANTS** SpaceX's motion to transfer venue; and (3) **DISMISSES** the complaint.

### A.    The Court May Not Consider SpaceX's Claims

The parties appear to agree that the launch service agreements at issue in this bid protest matter are not procurement contracts and that the LSARFP was not a procurement.  *See* Def. Mot. at 1-2, 24; Pl. Resp. at 5, 16; Def. Reply at 4-6; Oral Arg. Tr. 9:20-10:10.  The parties disagree, however, about whether the Air Force's evaluation and the portfolio award decisions for the LSA Competition are, nonetheless, "in connection with a procurement or proposed procurement," as contemplated by the Tucker Act.  Def. Mot. at 24-32; Pl. Resp. at 19-25.

In this regard, SpaceX argues that the Air Force's evaluation and portfolio award decisions are "in connection with" the ongoing procurement of launch services during Phase 2 of the Program, because the LSA Competition "was the third step in a multi-stage procurement process that the [Air Force] devised to fulfill the [a]gency's identified need to procure domestic launch services." Pl. Resp. at 2; *see also id*. at 19-25. The government counters that the Air Force's decisions are not "in connection with a procurement or proposed procurement," because the LSA Competition involved a solicitation that was separate and distinct from the Phase 2 Procurement. Def. Mot. at 28-32; Def. Reply at 11-16. For the reasons set forth below, the Court agrees.

### 1.    LSAs Are Not Procurement Contracts

As an initial matter, there can be no genuine dispute that the LSAs at issue in this dispute are not procurement contracts that fall within the purview of this Court's bid protest jurisdiction. The administrative record shows that the Air Force entered into the LSAs pursuant to the authority that Congress granted to the DoD to enter into other transactions under 10 U.S.C. §§ 2371 and 2371b. AR Tab 38 at 1263; 10 U.S.C. §§ 2371 and 2371b; *see also* Def. Mot. at 1-2, 18, 24; Pl. Resp. at 5, 16, 26. Neither this Court nor the Federal Circuit has examined the question of whether the Court's bid protest jurisdiction extends to disputes involving the award of LSAs. But, the Federal Circuit has made clear that the Tucker Act's bid protest language "is exclusively concerned with procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010); *see also United States v. Testan*, 424 U.S. 392, 399 (1976) ("'[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'") (citation omitted). And so, this dispute must concern a procurement solicitation or contract to fall within the boundaries of the Tucker Act.

The Federal Circuit has also held that this Court must dismiss a bid protest action challenging the award of cooperative farming agreements for lack of subject-matter jurisdiction, because cooperative farming agreements are not procurement contracts. *Hymas*, 810 F.3d at 1320, 1329-30. And so, the Court reads *Hymas* to require that it must dismiss a bid protest matter challenging agency decisions that are related to the award of an agreement that is not a procurement contract. *Id.*

In this case—like in *Hymas*—the record evidence makes clear that the LSAs are not procurement contracts.  *See* 10 U.S.C. § 2371(a); *see also* 32 C.F.R. § 3.2.  Rather, the administrative record shows that the Air Force entered into the LSAs pursuant to the authority that Congress has granted to DoD to enter into other transactions pursuant to 10 U.S.C. § 2371b. The administrative record also shows that LSAs are are not subject to the federal laws and regulations applicable to procurement contracts.  AR Tab 38 at 1263; *see also MorphoTrust USA, LLC*, B-412711, 2016 WL 2908322, at *4 (Comp. Gen. May 16, 2016).  Given this, the Court agrees with the government that this Court may not exercise its bid protest jurisdiction under the Tucker Act to consider a challenge to the Air Force's evaluation and portfolio award decisions.[4]  *Hymas*, 810 F.3d at 1320, 1329-30; *Res. Conservation Grp.*, 597 F.3d at 1245 (stating that the Tucker Act's bid protest language "is exclusively concerned with procurement solicitations and contracts"); RCFC 12(b)(1).

### 2.   SpaceX Has Not Shown That The Air Force's Decisions Are In Connection With A Procurement

SpaceX also has not shown that the Air Force's evaluation and portfolio award decisions during the LSA Competition are "in connection with a procurement or proposed procurement." The Federal Circuit has held that "[t]he operative phrase 'in connection with' is very sweeping in scope."  *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d at 1286, 1289 (Fed. Cir. 1999). But, the Federal Circuit has also recognized that there are limits to this Court's bid protest jurisdiction under the Tucker Act.  *See, e.g.*, *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1330 (Fed. Cir. 2018).  And so, not every decision *related* to a procurement is "in connection with a procurement or proposed procurement" as contemplated by the Tucker Act.

In this case, SpaceX argues with some persuasion that the Air Force's evaluation and portfolio award decisions are related to the Air Force's Phase 2 Procurement, because the LSA portfolio award will lead to the development of launch vehicles to be bid during the Phase 2 Procurement.  Pl. Mot. at 2; Oral Arg. Tr. at 36:23-36:25.  In this regard, the administrative

---

[4] The Court does not reach the issue of whether other transactions generally fall beyond the Court's bid protest jurisdiction under the Tucker Act.  The Court simply concludes that the specific facts in this case show that the LSAs at issue are not procurement contracts and therefore, the Air Force's decisions related to the award of these agreements may not be reviewed by the Court pursuant to the bid protest provision of the Tucker Act.

record shows that the LSA Competition and Phase 2 Procurement share the mission of assuring the Nation's access to space and eliminating reliance upon Russian-made rocket engines.  AR Tab 19 at 791; *see also* AR Tab 19 at 786; AR Tab 38 at 1260 (stating the goal of the Program "is to leverage commercial launch solutions in order to have at least two domestic, commercial launch service providers that also meet [National Security Space] requirements, including the launch of the heaviest and most complex payloads").  During oral argument, SpaceX also correctly observed that the funding provided by the Air Force pursuant to the LSAs will aid the development of prototype launch vehicles that Blue Origin, Orbital ATK and ULA will bid during the Phase 2 Procurement.  Oral Arg. Tr. at 29:21-29:25; 36:21-37:1; 57:5-57:12.  And so, the record evidence shows that the funding provided pursuant to the LSAs will help the Air Force competitively procure launch services during the Phase 2 Procurement.  AR Tab 38 at 1260.

But, the record evidence also shows that, while related to the Phase 2 Procurement, the Air Force's evaluation and portfolio award decisions are not "in connection with" that procurement for several reasons.

First, as the government persuasively argues in its motion to dismiss, the administrative record shows that the LSA Competition and the Phase 2 Procurement involve separate and distinct solicitations.  Def. Mot. at 28-29; Def. Reply at 12-13.  It is a well-established tenet of procurement law that a selection decision made under one procurement or solicitation does not govern the selection under a different procurement or solicitation.  *SDS Int'l v. United States*, 48 Fed. Cl. 759, 772 (2001); *see also Griffy's Landscape Maint. LLC v. United States*, 51 Fed. Cl. 667, 671 (2001) ("[A]n attack upon a new solicitation or upon any other aspect of the administration of the previous contract, must stand on its own.").  And so, generally, the Court must view the Air Force's evaluation and portfolio award decisions during the LSA Competition separately from the selection of awardees for the Phase 2 Procurement for launch services contracts.  *Id.*

In this case, the Air Force's Acquisition Strategy Document for the Program makes clear that the Program consists of a four-phase strategy that will employ different solicitations and other steps to be implemented by the Air Force between FY 2013 to FY 2027.  *See* AR Tab 19 at 788.  Specifically, this document provides that the LSA Competition sought certified launch

service providers to develop launch system prototypes and that this competition commenced in FY 2017 and will conclude in FY 2024. *Id. Id.* at 786, 788. By comparison, the Air Force's Acquisition Strategy Document shows that the Phase 2 Procurement will involve a procurement for launch services and that this procurement will commence in FY 2020 and will conclude in FY 2024. *Id.* at 788. And so, the record evidence supports the government's view that the LSA Competition and the Phase 2 Procurement are two separate and distinct parts of a multi-phase program.

Second, the administrative record also shows that the LSA Competition and the Phase 2 Procurement involve different acquisition strategies. Def. Mot. at 29-30; Def. Reply at 13. As discussed above, the Air Force issued the LSARFP to facilitate the successful development of launch systems pursuant to the DoD's authority to enter into other transactions. AR Tab 38 at 1263. And so, the LSA Competition was not subject to the requirements of the FAR. AR Tab 35 at 1068 ("[T]he FAR and its supplements do not apply to this selection process"); *see also* AR Tab 19 at 794-95; 10 U.S.C. §§ 2371 and 2371b; Def. Mot. at 29. In contrast, the Phase 2 Procurement will involve a FAR-based competition. AR Tab 19 at 807 (stating that "the Air Force intends to use a full and open competition to award FAR-based [firm-fixed priced] contracts to two launch providers for [National Security Space] launch service procurements"). Given this, the record evidence makes clear that the LSA Competition and the Phase 2 Procurement also differ with regards to how bidders will compete and the legal requirements that govern each solicitation.

The administrative record also makes clear that the specific goals of the LSA Competition and the Air Force's Phase 2 Procurement differ. The goal of the LSA competition is to increase the pool of launch vehicles that meet the Air Force's needs by "invest[ing] in industry to develop enhanced configurations to support all [National Security Space] requirements." AR Tab 19 at 789. By comparison, the goal of the Phase 2 Procurement is to procure, through requirements contracts awards, "launch services." *Id.* at 786.

In addition—and perhaps more significantly—the administrative record makes clear that the LSA Competition did not involve the procurement of any goods or services by the Air Force. AR Tab 38 at 1261; *see also* Oral Arg. Tr. at 21:3-21:12. While it is undisputed that the Air Force will provide funding to develop launch service prototype vehicles under the LSAs, the Air

Force will not purchase or own these prototypes.  AR Tab 38 at 1261; Oral Arg. Tr. at 21:3-21:20.  Nor will the Air Force acquire any services under the LSAs.  AR Tab 38 at 1261; Oral Arg. Tr. at 21:15-21:16; 26:15-26:22.  And so, unlike the Phase 2 Procurement, the LSA Competition did not involve an acquisition of goods or services.

Given the aforementioned differences between the LSA Competition and the Phase 2 Procurement, the record evidence supports the government's view that the evaluation and portfolio award decisions during the LSA Competition are distinct agency decisions that are not connected to the Phase 2 Procurement.  *BayFirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 507 (2012).

The Court is also not persuaded by SpaceX's arguments that the Court may consider its claims, notwithstanding the evidence showing that the LSA Competition and Phase 2 Procurement are distinct and separate solicitations.

First, SpaceX argues without persuasion that Tucker Act jurisdiction is established in this case, because the Air Force's portfolio award decision will impact the government's acquisition of launch services in the future.  Pl. Resp. at 21-23.  But, in *R&D Dynamics Corp. v. United States*, this Court recognized that the fact that resources expended by the government during one phase of a government program may lead to the development of the capacity to provide goods and services in the future does not, alone, render an award a "procurement."  80 Fed. Cl. 715, 722 (2007) (holding that a Phase II Small Business Innovation Research ("SBIR") award was not a procurement, and therefore the award could not be "in connection with" a Phase III procurement as contemplated by the Tucker Act).  Similarly here, the fact that the development of prototype launch vehicles could eventually lead to the Air Force's acquisition of launch services is not sufficient, alone, to render the Air Force's decisions "in connection with" the Phase 2 Procurement in this case.  *Id.*

SpaceX's argument that the LSA Competition must be "in connection with" the Phase 2 Procurement is also contradicted by the undisputed fact that the Phase 2 Procurement will be a fully open competition.  Notably, the administrative record shows that the Phase 2 Procurement will be open to all interested offerors and that this procurement will not be limited to the three companies that have been awarded LSAs.  AR Tab 19 at 786 ("FAR-based procurement contracts will be competitively awarded to certified EELV launch service providers, which could

include companies that were not previously awarded LSAs"); *id.* at 807 ("[T]he Air Force intends to use a full and open competition to award FAR-based [firm-fixed priced] contracts to two launch providers for [National Security Space] launch service procurements . . . ").

During oral argument, SpaceX acknowledged that it will compete for the award of a launch services contract during the Phase 2 Procurement, even though SpaceX was not awarded a launch service agreement during the LSA Competition.  Oral Arg. Tr. at 37:14-37:21.  Given this, the record evidence makes clear that the Air Force's portfolio award decision during the LSA Competition will not dictate the outcome of the Phase 2 Procurement, as Space X suggests.  Pl. Resp. at 23.

Indeed, while SpaceX raises understandable concerns that it may be disadvantaged in the future by the fact that the Air Force is funding the development of launch vehicle prototypes by Blue Origin, ULA and Orbital, such concerns involve a potential challenge to the *Phase 2 Procurement*—which is not the subject of this dispute.  Oral Arg. Tr. at 37:5-37:8; 39:22-40:6.  The Court also acknowledges that the question of whether the decisions made by the Air Force during the LSA Competition are "in connection with" the Phase 2 Procurement is a close one, given the evidentiary record in this case.  But, the Court must answer this question based upon the totality of the record evidence and this evidence indicates that, while related, the LSA Competition and the Phase 2 Procurement are separate and distinct solicitations for the National Security Space Launch Program.

The Court also takes into consideration the intent expressed by Congress to remove the LSAs—which are not procurement contracts—from the legal requirements and process that govern procurement contracts.  *See* 10 U.S.C. §§ 2731, 2731b; *see also* Def. Mot. at 6-7; Oral Arg. Tr. at 17:21-18:8.  And so, for these reasons, the Court **GRANTS** the government's motion to dismiss this bid protest matter for lack of subject-matter jurisdiction.  RCFC 12(b)(1).

Because the Court finds that the LSAs are not procurement contracts and that  the Air Force's evaluation and portfolio award decisions during the LSA Competition are not "in connection with" the Phase 2 procurement, the Court does not reach the remaining jurisdictional issues raised in the government's motion to dismiss.

### B.  Transfer Of This Matter Is In The Interest Of Justice

As a final matter, the Court agrees with SpaceX that a transfer of this matter to the United States District Court for the Central District of California would be in the interest of justice. SpaceX requests that the Court transfer this matter to the United States District Court for the Central District of California, should the Court determine that it lacks subject-matter jurisdiction to consider its claims.  Pl. Resp. at 37-39.  Title 28, United States Code, section 1631 provides that the Court "shall" transfer an action to another federal court when:  (1) the transferring court finds it lacks jurisdiction; (2) the proposed transferee court is one in which the case could have been brought at the time it was filed; and (3) the transfer is in the interest of justice.  28 U.S.C. § 1631; *see also Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1303 (Fed. Cir. 2008).  Each of these circumstances has been met here.

First, SpaceX persuasively argues that the claims asserted in the complaint could have been brought in the United States District Court for the Central District of California at the time Space X commenced this action.  Pl. Resp. at 37-38; *see also* 28 U.S.C. § 1391(b)(2) (stating that a civil action may be brought against the United States in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated").  SpaceX represents that its principal place of business is located within the Central District of California and that the Air Force office that made the evaluation and portfolio award decisions for the LSARFP is also located within that district.  Pl. Resp. at 38.  And so, Space X has shown that that the events giving rise to its claims occurred within in the Central District of California.

SpaceX has also shown that it would be in the interest of justice to transfer this case to the district court.  *See* Pl. Resp. at 38-39; *see also Galloway Farms, Inc. v. United States*, 834 F.2d 998, 1000 (Fed. Cir. 1987) (stating that "[t]he phrase 'if it is in the interest of justice' relates to claims which are nonfrivolous and as such should be decided on the merits (citing *Zinger Constr. Co. v. United States*, 753 F.2d 1053, 1055 (Fed. Cir. 1985)).  SpaceX alleges non-frivolous claims in this matter that the Air Force's evaluation and portfolio award decisions were unreasonable and in violation of federal law.  Compl. at ¶¶ 101, 209.  Specifically, SpaceX alleges, among other things, that the Air Force based the portfolio award decision on an arbitrary and unequal evaluation process and that the Air Force's portfolio award decision violates the

assured access to space requirements mandated by Congress.  *See* Compl. at ¶ 227.  Given the non-frivolous nature of SpaceX's claims, the Court believes that SpaceX should be afforded the opportunity to pursue these claims in the district court.  And so, the Court **GRANTS** SpaceX's motion to transfer venue to the United States District Court for the Central District of California.

## V.      CONCLUSION

In sum, the administrative record in this bid protest matter makes clear that the LSAs are not procurement contracts and that the Air Force's evaluation and portfolio award decisions during the LSA Competition were not "in connection with" the Phase 2 Procurement.  Space X has also shown that it is in the interest of justice to transfer this matter to the United States District Court for the Central District of California.  And so, for the foregoing reasons, the Court:

1.  **GRANTS** the government's motion to dismiss;

2.  **GRANTS** SpaceX's motion to transfer venue; and

3.  **DISMISSES** the complaint.

The Clerk is directed to transfer the above captioned case to the United States District Court for the Central District of California.

Each party to bear its own costs.

The Clerk shall enter judgment accordingly.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the Protective Order entered in this matter on May 22, 2019.  This Memorandum Opinion and Order shall therefore be filed **UNDER SEAL**.  The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the Protective Order prior to publication.

The parties shall **FILE** a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the basis for each proposed redaction, on or before **October 30, 2019**.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge